COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| DEREK SCHANEN SHAW, | § | No. 08-07-00206-CR |
| Appellant, | § | Appeal from the |
| v. | § | 396th District Court |
| | § | |
| THE STATE OF TEXAS, | § | of Tarrant County, Texas |
| | § | |
| Appellee. | § | (TC# 1064766R) |
| | § | |

**O P I N I O N**

Appellant Derek Shaw appeals the trial court's denial of his motion to suppress his in-court identification. After the court's denial, Appellant plead not guilty to an indictment accusing him of aggravated robbery of an elderly person. The jury convicted Appellant and his punishment was enhanced by a prior aggravated robbery conviction. We overrule Appellant's sole point of error and affirm the trial court's denial of his motion to suppress.

Appellant filed a motion to suppress his in-court identification because the on-scene show-up was impermissibly suggestive. The court conducted a pretrial hearing on that motion. The State called three witnesses: Fort Worth Police Officer John E. Collins, Robin Ann Evans, and William Carl Evans.

Officer Collins testified that on September 14, 2006, he was the first officer to observe and detain the Appellant at an intersection located north of the Payless Shoe Store where the offense was reported to have occurred. When the officer first saw Appellant, he was carrying something and approaching a vehicle stopped at the intersection. When he moved away from the

vehicle, he was empty handed. Appellant was handcuffed and searched and officers found a magazine. Officer Collins testified the magazine matched an Airsoft pistol; which officers searching the area found in a trash can.

Officer Collins took the Appellant back to the Payless store for a field show-up:

Q. Can you tell the Judge about the order of witnesses and what the results were?

A. I don't remember exactly what the order was. I think it was the husband and wife probably together. I brought them from the Payless ShoeSource. He was in the back of the patrol car and just brought them out there to look in the back of the patrol car.

Officer Collins testified the couple were brought together. At that point, Officer Collins indicated to the couple that they had somebody in custody. Before the couple went to look at the person, they gave a physical description. They described a black male, approximately six-foot, thin, skinny, wearing a dark shirt and dark pants and some rosary beads. The show-up was conducted between forty-five minutes to an hour after he took Appellant into custody. He also testified that he told the witnesses that "we have detained someone" or possibly "we got him." Appellant was the only black male at the show-up. During the show-up, Officer Collins reached inside Appellants shirt and pulled out a rosary to show the witnesses.

Robin Evans testified she saw a black male dressed in dark blue and wearing a beaded cross and baseball cap knock an elderly lady down and steal her purse. She and her husband, William Evans, followed the man in their car until he pulled a gun and pointed it at them. She testified that while she and her husband were talking with the police, they were told that the police wanted them to look at a suspect who was being brought to the scene. Her husband looked at the suspect first and then she looked at him. She testified that she recognized him

because of the clothes he had on and the necklace he was wearing. She testified she was confident the police arrested the man who pointed the gun at her.

William Evans testified he saw a six-foot tall, skinny, black male steal a lady's purse in the Payless store parking lot. The woman fell to the ground and Mr. Evans honked his horn and was following the man until he pointed a gun at them. He described the man as wearing a dark blue shirt, dark blue or black pants, a "North Carolina blue" hat, and a rosary around his neck. While they were waiting for the police, Mr. Evans walked behind the store and found the purse. The prosecutor asked Mr. Evans if the police asked him to look at someone:

Q.     [D]id the police ask you to look at anybody?

A.     Yes.

.          .          .

Q.     What did they say to you?

A.     They said they caught a guy down at the Raceway down the street.

Q.     Did they know if he was the right guy or not?

A.     They didn't say. They said they think it's the same guy.

Q.     Okay.

A.     But he didn't have a hat on.

Mr. Evans testified he was certain that the man in police custody was the same man who pointed a gun. He said he had seen the same man earlier standing outside the Wal-Mart and thought he looked suspicious and "was looking to rob somebody or something." He identified Appellant as the same person he identified for the police. Mr. Evans testified that seeing the man's clothing and face made him comfortable with his identification. The clothing made him a

"hundred percent" certain of his earlier identification, but his identification in court was based on seeing Appellant with the gun and later when he was sitting in the squad car. He testified that the show-up made him more certain of his identification and that would have been more difficult if he had only seen pictures and had not seen the clothing.

The court denied Appellant's motion to suppress. During the trial, Robin Evans identified Appellant as the person she saw steal the purse and point a gun at her. William Evans identified Appellant as the person he saw steal the purse, point a gun at his wife and him, and testified the Appellant was wearing a "Carolina Panthers" baseball cap. Doris Mills, the seven-two-year-old victim, described her attacker as being a dark man who was wearing blue clothing, a hat, and something around his neck. She was unable to identify the man in police custody by his face, but she recognized his shirt and pants and shoes. She could not identify Appellant in court.

Appellant argues the trial court erred in denying his motion to suppress his in-court identification because the pretrial identification procedure was impermissibly suggestive.

An on-the-scene identification possesses a degree of suggestiveness, and under certain circumstances, it may amount to a denial of due process. *See Garza v. State*, 633 S.W.2d 508, 512 (Tex.Crim.App. 1982)(Opin. on reh'g). Nevertheless, the admission of evidence of a one person show-up, without more, does not violate due process. *Id.* Where a witness has made an in-court identification, Appellant must show that it was tainted by improper pretrial procedure and confrontation. *In re G.A.T.*, 16 S.W.3d 818, 827 (Tex.App.--Houston [14th Dist.] 2000, pet. denied). In determining the admissibility of an in-court identification, we employ a two-step inquiry: (1) whether the out-of-court identification procedure was impermissibly suggestive; and

(2) whether that suggestive procedure gave rise to a very substantial likelihood of irreparable misidentification. *Id*. We examine the totality of the circumstances in any case to determine if due process has been violated. *Id*. These circumstances include: (1) the witness's opportunity to view; (2) the witness's degree of attention; (3) the accuracy of the description; (4) the witness's level of certainty; and (5) the time between the crime and the confrontation. *Garza*, 633 S.W.2d at 513.

In weighing these factors, the burden is on the accused to show, by clear and convincing evidence, that the witness's identification was unreliable. *See Pace v. State*, 986 S.W.2d 740, 744 (Tex.App.--El Paso 1999, pet. ref'd). The trial court's ruling admitting the identification is reviewed under an abuse of discretion standard, and the trial court's ruling should not be overturned if it is supported by the record. *See id*.

Under *Garza*, the first factor is the witness's opportunity to view. In this case, both William and Robin Evans had several minutes to observe the Appellant. William testified he actually observed Appellant at the Wal-Mart Store earlier before he saw him rob Mrs. Mills. Robin testified that she viewed Appellant from about twenty feet for a few minutes before he pointed the gun at her. The second factor is the witness's degree of attention. William testified he watched the robbery closely as it took place and even told Robin to look so she could give a description. The third factor is the accuracy of the description. Both William and Robin had very similar descriptions of the physical size and clothing the robber was wearing. Additionally, both witnesses described a unique article of jewelry on the witness, a large rosary. The forth factor is the witness's certainty of the description. At trial, both William and Robin were certain about their identifications of Appellant as the robber. William even testified he was 100 percent

after viewing Appellant's clothing.  The fifth factor is the time between the crime and the confrontation.  The show-up occurred the same night of the crime, approximately, forty-five minutes to an hour after the police attained Appellant.

Having considered the factors for the determination of reliability of a suggestive identification procedure under the totality of the circumstances, we find that the show-up procedure used by the officers in this case did not result in irreparable mistaken identification.  We find that Appellant's due process rights have not been violated.  We find the trial court did not abuse its discretion and its ruling is supported by the evidence in the record.  Accordingly, we overrule Appellant's sole point of error and affirm the trial court's decision.

February 3, 2010

DAVID WELLINGTON CHEW, Chief Justice

Before Chew, C.J., McClure, and Rivera, JJ.

(Do Not Publish)